**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| RAYTHEON COMPANY, a Delaware corporation, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | Civil Action No. __1:19-cv-251__ ) ) |
| BAE SYSTEMS, INC., a Delaware corporation; BAE SYSTEMS LAND & ARMAMENTS LP, a Delaware limited partnership; LEONARDO DRS, INC., a Delaware corporation; DRS NETWORK & IMAGING SYSTEMS, LLC, a Delaware limited liability company, | ) ) ) ) ) ) ) ) |
| Defendants. | |

**VERIFIED COMPLAINT**

Plaintiff Raytheon Company ("Raytheon") by its undersigned counsel, hereby files its Complaint against Defendants BAE Systems, Inc. ("BAE Systems"), BAE Systems Land & Armaments LP ("BAE Land & Armaments") (collectively "BAE"), Leonardo DRS, Inc. ("DRS, Inc."), and DRS Network & Imaging Systems, LLC ("DRS Network & Imaging") (collectively "DRS"), and alleges as follows:

**NATURE OF THE ACTION**

1. This is a civil action seeking preliminary and permanent injunctive relief—as well as compensatory damages—under the Defend Trade Secrets Act ("DTSA") and the Virginia Uniform Trade Secrets Act ("VUTSA"), and for breach of contract.

2. Plaintiff Raytheon is a corporation organized and incorporated under the laws of the State of Delaware, with its principal place of business located at 870 Winter Street, Waltham,

1

Massachusetts. Raytheon is a technology and innovation leader specializing in defense, civil government and cybersecurity solutions throughout the world.

3. Defendant BAE Systems, Inc. is a corporation organized and incorporated under the laws of the State of Delaware, with its principal place of business located at 1101 Wilson Boulevard, Arlington, Virginia. BAE Systems, Inc. is the U.S. subsidiary of BAE Systems, plc—which is an international defense, aerospace and security company—and is the immediate parent corporation of BAE Land & Armaments. BAE Systems, Inc. describes itself as part of the world's second largest defense and intelligence contractor.

4. Defendant BAE Land & Armaments is a limited partnership organized under the laws of Delaware, with its principal place of business located at 2000 North 15th Street, Arlington, Virginia.

5. Defendant DRS, Inc. is a corporation organized and incorporated under the laws of Delaware, with its principal place of business located at 2345 Crystal Drive, Arlington, Virginia. DRS, Inc. is a U.S. subsidiary of Leonardo S.p.A. DRS, Inc. focuses on the supply of products, services, and integrated support to, *inter alia*, defense companies. Defendant DRS Network & Imaging is a limited liability company also organized under the laws of Delaware, with its principal place of business located at 100 North Babcock Street, Melbourne, Florida. DRS Network & Imaging is a subsidiary of DRS, Inc. DRS Network & Imaging's mailing address is also 2345 Crystal Drive, Arlington, Virginia.

**JURISDICTION AND VENUE**

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Raytheon asserts a claim for misappropriation of trade secrets under the DTSA against BAE and DRS.

7.      This Court has supplemental jurisdiction over Raytheon's remaining state law claims pursuant to 28 U.S.C. § 1367 because such claims are so related to the DTSA claim that they form part of the same case or controversy under Article III of the United States Constitution.

8.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because BAE and DRS operate their principal places of business in this district.

## FACTUAL BACKGROUND

### A. Raytheon Develops Its Innovative Gunner's Primary Weapon Sight System

9.      Raytheon is an industry leader in defense and government electronics. The military products that it designs are used around the world by the United States and its allies.

10.      For example, Raytheon has developed numerous combat-proven air and missile defense systems, including the Patriot missile system, which is an important element of the air and missile defense architecture for the United States and more than a dozen other nations.

11.      Raytheon also provides the United States and its allies with a wide variety of equipment for land-based warfare, including anti-tank missiles, long-range surveillance Sensors, and combat vehicle Fire Control Sights for the United States Army and United States Marine Corps.

12.      In 2016, Defendant BAE decided to pursue a contract with the United States Army to build armored Mobile Protected Firepower vehicles—which are essentially light tanks with the Main Battle Tank firepower—for use across the globe and to be deployed at multiple Army locations around the United States. The Army is seeking Mobile Protected Firepower vehicles to fulfill a need for a weapon that easily can be transported by airplane. While a traditional tank is too large and too heavy to transport quickly, Mobile Protected Firepower

vehicles can be deployed rapidly while still providing Main Battle Tank-like firepower support to soldiers on the ground. The Mobile Protected Firepower vehicle is also more maneuverable than a typical tank.

13. The relatively small size envisioned for Mobile Protected Firepower vehicles presents significant engineering challenges. The turret of the Mobile Protected Firepower vehicle—i.e., the upper half of the vehicle—is smaller than the turret of a traditional Main Battle Tank but must contain analogous equipment while still leaving room for the vehicle's crew.

14. As part of BAE's bid efforts, it asked Raytheon to design and supply a sighting system that will serve as the Mobile Protected Firepower vehicle's gunner's eyes to the outside world. BAE chose Raytheon because of Raytheon's technical expertise and its willingness to invest its own resources in the necessary research and development to create cutting-edge sighting technology. While BAE's original concept for the Mobile Protected Firepower vehicle included a sighting system baselined on a first-generation design created in 1994 by Hughes Aircraft, BAE believed Raytheon was best positioned to design the kind of next-generation compact sighting system needed.

15. Beyond the basic requirements outlined by the Army, BAE by-and-large left the details of the sighting system's design to Raytheon. BAE told Raytheon only that the sighting system needed to meet the specified performance requirements and needed to fit within a limited space in the Mobile Protected Firepower vehicle's turret.

16. In response, Raytheon spent months of work and millions of dollars developing its innovative Gunner's Primary Weapon Sight System ("the PWS System").

17. The PWS System is a dramatic improvement over the first-generation sighting system outlined in the 1994 Hughes Aircraft document. Not only does it offer significantly

better second-generation performance than the 1994 Hughes Aircraft design, but the entire PWS System fits neatly into an even smaller amount of space than the first-generation technology.

### B. Raytheon And BAE Enter Into A Strict Proprietary Information Agreement To Share Trade Secrets

18. Effective May 10, 2016, Raytheon entered into a propriety information agreement ("the Agreement") with BAE Land & Armaments so the two companies could safely share proprietary information "in oral, visual, or written form" about "future armored Fighting Vehicles" like the Mobile Protected Firepower vehicle. *See* Exhibit A at 1 & ¶ 1.

19. As part of the Agreement, BAE and Raytheon pledged that the party receiving the proprietary information "shall maintain [it] in confidence and shall not use such Proprietary Information except for the Purpose of this Agreement." Ex. A ¶ 2. This means, *inter alia*, that the receiving party (1) "shall not reverse engineer, decompile, or disassemble any products or software of the disclosing party" and (2) must "use the same care and discretion as the receiving Party uses with respect to similar information of its own, but not less than reasonable care, to avoid unauthorized disclosure, publication, dissemination or use of Proprietary Information received hereunder." *Id.* Indeed, even if the receiving party were required by law to disclose the proprietary information, under the agreement it could only do so after giving the other party "prior written notification" five days beforehand. *Id.*

20. The Agreement expressly provides that the proprietary information disclosed "shall not be distributed, disclosed or disseminated to any third party" and indeed "shall only be disclosed to the receiving Party's employees on a need-to-know basis for the Purpose of this Agreement." Ex. A ¶ 4.

21. The parties also agreed that "due to the unique nature" of proprietary information, "there can be no adequate remedy at law for any breach." Ex. A ¶ 9. Accordingly, "because any

5

such breach may result in irreparable harm to the disclosing party,… the disclosing Party shall be entitled to seek appropriate equitable relief in addition to remedies it might have at law" in the event of a breach. *Id.*

22. Finally, the parties agreed that the law of Virginia would govern interpretation of the Agreement. Ex. A ¶ 18.

**C. BAE Issues a Request For a Proposal On A Gunner Sight System And Raytheon Bids, Disclosing Trade Secrets In the Process**

23. Prior to 2018, Raytheon received a request for a proposal from BAE, soliciting bids for the design and supply of a "Gunners Primary Weapon Sight System" for use in the Mobile Protected Firepower vehicle.

24. On information and belief, BAE sent the original request for proposal to Raytheon alone.

25. On information and belief, BAE intended to use Raytheon's design to support its own bid on a broader contract to manufacture Mobile Protected Firepower vehicles for the U.S. Army.

26. On February 23, 2018, Raytheon submitted an extensive bid to BAE, which included accompanying documentation detailing how Raytheon planned to construct the PWS System. The documents describing the PWS System included proprietary technical information that was of significant value to Raytheon.

27. For example, while the original BAE request for proposal did not provide any specific details about the precise dimensions of individual pieces of the PWS System, Raytheon's bid provided intricate diagrams laying out the precise shapes, configurations, and dimensions of the PWS System as a whole and four individual pieces—the primary weapon

sight, the control unit, the power supply unit, and display unit (collectively, "the System Dimensions and Configuration Trade Secret").

28. The System Dimensions and Configuration Trade Secret was not dictated by the vehicle's layout. Rather, the initial request for proposal from BAE simply provided the largest possible dimensions for the space available to the System and left it to Raytheon to provide the details. Accordingly, Raytheon was required to engineer its own solution to the problem of fitting a fully-featured sighting system into the relatively small turret of the Mobile Protected Firepower vehicle.

29. The shapes, configurations, and precise measurements developed by Raytheon had enormous value because they revealed to any trained professional how to solve the difficult problem of fitting a compliant design within the small turret of the Mobile Protected Firepower vehicle without having to go through an extensive independent design process.

30. As another example, Raytheon's bid also included detailed information about a particular facet of the System—the gunner's primary weapons sight. The primary weapons sight allows the soldier using the System (the "gunner") to see the landscape surrounding the vehicle via outward facing Day View Optics. As part of its design efforts, Raytheon discovered the optimal wavelength to provide clear detail to the colors in the surrounding landscape during daytime, a critical piece of information ("the Wavelength Trade Secret").

31. This wavelength range was determined to be optimal after extensive trial and error, based on a method of testing applied by Raytheon to Raytheon's own design. It is more finely tuned than the standard in the industry. The narrower range makes it easier for a gunner to discern targets in the haze and degraded conditions of a battlefield environment.

32. Raytheon's bid included additional proprietary information and clearly labeled all of the proprietary information that was included.

33. After receiving Raytheon's bid, BAE entered into technical discussions with Raytheon under the protection of a non-disclosure agreement. Those discussions were in furtherance of Raytheon serving as the source for the PWS System within the Mobile Protected Firepower vehicle.

34. As late as November 8, 2018, BAE acknowledged that all of the properly marked information in the Raytheon bid was Raytheon's proprietary information.

35. At no point between Raytheon's bid in February 23, 2018 and November 8, 2018 did BAE ever dispute that any items included in Raytheon's proprietary documents were not truly Raytheon's proprietary information.

**D. BAE Sends Out A Revised Request For Proposal To Raytheon And DRS That Incorporates Raytheon's Trade Secrets**

36. Based in part on Raytheon's System, on December 17, 2018, the U.S. Army awarded BAE the Mobile Protected Firepower vehicle contract, an agreement worth over $375 million. The facilities that BAE used to manufacture the bid sample submitted to the government are located in Minnesota and Michigan.

37. On December 21, 2018, BAE sent out a revised request for proposal for a Primary Weapon Sight System—the same type of system that Raytheon had developed in order to help BAE bid for and win the contract award.

38. On information and belief, BAE sent the revised request for proposal to at least Raytheon and DRS.

39. The revised request included more detail than the original request. In particular, an attached specification incorporated numerous instances of Raytheon's proprietary information

8

that were included as part of Raytheon's original bid, including among others the System Dimensions and Configuration Trade Secret and the Wavelength Trade Secret. For example, the revised request recited the Wavelength Trade Secret verbatim despite the fact that a different wavelength range is the industry norm. And the revised request asked for bids on a sighting system that uses almost precisely the same shapes, size, and configurations as the System Dimensions and Configuration Trade Secret.

40. The revised request solicited competitive bids, with an initial deadline of January 18, 2019, which was moved to January 31, 2019.

**E. Raytheon Informs BAE That It Disclosed—And Informs DRS That It Received—Raytheon's Proprietary Information But Both BAE and DRS Refuse To Take Appropriate Action**

41. Examination of the revised request for proposal and attached specification revealed that they improperly contained a substantial amount of Raytheon trade secret and proprietary information. On January 18, 2019, Raytheon sent BAE a letter that (1) documented the various Raytheon trade secrets BAE had disclosed in the request for proposal, (2) asked for an explanation, and (3) requested that BAE take a number of mitigating steps. Over the following weeks, Raytheon and BAE exchanged a number of letters.

42. In brief, Raytheon repeatedly explained to BAE that the revised request for proposal improperly disclosed many of Raytheon's trade secrets, including the System Dimension and Configuration Trade Secret and the Wavelength Trade Secret. Raytheon urged BAE to take appropriate measures to mitigate its disclosure of Raytheon's trade secrets. And Raytheon asked BAE to push back the deadline for submitting a bid on the revised request for proposal until after the issues involving Raytheon's trade secrets were resolved.

43. BAE initially responded that the revised request did not disclose any Raytheon trade secrets and that any resemblance to Raytheon's trade secrets was either a coincidence or reflected the only way to satisfy the performance and system-level requirements set by the Army.

44. BAE subsequently pivoted to the assertion that the vast majority of Raytheon's trade secrets were taken directly from the 1994 Hughes Aircraft document detailing the specifications for the first-generation sight system that the System was intended to replace. BAE was unwilling or unable, however, to have its engineers explain to Raytheon how they could have coincidentally landed on so many of the exact same concepts, words, and numbers found in Raytheon's specification.

45. On February 13, representatives from BAE and Raytheon met in person.

46. On February 14, BAE issued a second revised request for proposal that omitted reference to some of Raytheon's trade secrets, including the Wavelength Trade Secret. It did not, however, change the request for proposal to avoid disclosing the System Dimensions and Configuration Trade Secret or a number of others.

47. On the same day, Raytheon sent two letters—one to DRS and one to BAE.

48. Raytheon notified DRS that DRS had acquired Raytheon's trade secrets as a result of BAE disclosing Raytheon's proprietary information and intellectual property without authorization in the revised request for proposal.

49. Raytheon did not receive a formal reply from DRS.

50. BAE responded a week later, on February 21. Its letter confirmed that it had transmitted the second revised proposal—and thus Raytheon's trade secrets—to DRS. BAE did not agree to remove the remaining proprietary information from its second revised proposal.

51. Raytheon submitted a bid in response to the second revised proposal on March 1, 2019. If Raytheon receives the contract, it will manufacture the PWS System in California and Texas.

**E. BAE's Unauthorized Disclosure Of Raytheon's Trade Secrets Transforms DRS From A Supplier To A Direct Competitor**

52. Upon information and belief, DRS did not have the technical knowledge sufficient to submit a competitive bid in response to the revised request for proposal or the second revised request for proposal until BAE improperly disclosed Raytheon's trade secrets.

53. Indeed, prior to BAE's issuance of the revised request for proposal, Raytheon was relying on DRS to supply a key component as part of Raytheon's planned bid to BAE.

54. Following Raytheon's February 14 letter, DRS notified Raytheon—via an email to an individual Raytheon employee—that it would not supply Raytheon with that component unless Raytheon agreed to hold DRS harmless from all claims associated with BAE's unauthorized disclosure of trade secrets.

55. Because Raytheon was not willing to make this significant concession—which would risk destroying its valuable trade secret rights—DRS did not supply the requisite component.

56. Instead, Raytheon was delayed by the need to figure out an alternative approach, which in turn slowed Raytheon's ability to submit a bid in response to BAE's revised request.

57. Moreover, BAE's unauthorized disclosure of Raytheon's trade secrets has resulted in the exact outcome that the proprietary information agreement was meant to prevent—namely, that Raytheon now has at least one new competitor to develop and build the PWS System that Raytheon designed.

58. BAE has confirmed to Raytheon that DRS has submitted a bid in response to the second revised request for proposal. DRS' manufacturing facility is located in Florida.

**F. As a Result of BAE And DRS' Actions, Raytheon Has And Will Continue To Suffer Irreparable Harm Absent Injunctive Relief**

59. Raytheon will suffer irreparable harm absent immediate injunctive relief.

60. BAE's unauthorized disclosure—and DRS' improper acquisition and use—of Raytheon's trade secrets means that the proprietary information that Raytheon spent time, money, and effort in developing will be available to others with no guarantee of secrecy. In other words, unless enjoined, BAE and DRS will destroy Raytheon's trade secret protection.

61. Moreover, BAE and DRS' improper acts have led to the additional irreparable harm of transforming one of Raytheon's suppliers—DRS—into a new competitor in the military sight system market.

62. Finally, BAE and DRS' improper acts will damage Raytheon's reputation and goodwill in the competitive world of military contracts. BAE has already begun to question Raytheon's ability to fulfill contracts in a timely fashion—despite the fact that BAE's unauthorized disclosure of Raytheon's valuable proprietary information (coupled with DRS' subsequent refusal to supply a key component to Raytheon) is what created the delay in the first place.

<u>**COUNT I**</u>
**(Violation of The Defend Trade Secrets Act—18 U.S.C. § 1836 *et seq*.)**

63. The allegations contained in paragraphs 1 through 62 above are repeated and re-alleged as if fully set forth herein.

64. The proprietary information improperly disclosed in BAE's revised request for

proposal—including but not limited to the System Dimensions and Configuration Trade Secret and the Wavelength Trade Secret—was the product of hard work and technical experience. It was not generally known or available to the public or readily ascertainable by other means and it had value precisely because it was secret.

65. Raytheon took reasonable steps to preserve the secrecy of the proprietary information that was improperly disclosed in BAE's revised request for proposal. These steps included requiring BAE to sign the Agreement, and notifying both BAE and DRS when Raytheon became aware that its proprietary information had been improperly disclosed.

66. Raytheon's trade secrets are related to a product used in interstate or foreign commerce. The trade secrets relate to the gunner's primary weapon sight system for a Mobile Protected Firepower vehicle—a vehicle intended for use abroad.

67. BAE misappropriated Raytheon's trade secrets by disseminating them in the revised request for proposal to DRS without authorization, in violation of the Agreement.

68. DRS misappropriated Raytheon's trade secrets. It acquired them through improper means—i.e., by BAE's breach of the Agreement—and was promptly informed by Raytheon of this fact.

69. DRS also misappropriated the trade secrets by using them in its bid responding to BAE's second revised request for proposal, despite Raytheon's express notice to DRS that the revised request contained Raytheon's trade secrets.

70. Despite repeated communications from Raytheon, BAE and DRS have failed to cease their misappropriation.

71. As set forth above, BAE and DRS' actions violate the DTSA.

72. As a direct and proximate result of BAE and DRS' actions, Raytheon has suffered substantial damages in an amount that will be established at trial.

73. Moreover, BAE and DRS' actions have caused and will cause Raytheon irreparable harm if not preliminarily and permanently enjoined.

### COUNT II
### (Violation of The Virginia Uniform Trade Secrets Act –Va. Code Ann. § 59.1-336)

74. The allegations contained in paragraphs 1 through 73 above are repeated and realleged as if fully set forth herein.

75. As set forth in greater detail above, DRS and BAE misappropriated Raytheon's valuable trade secrets.

76. The proprietary information disclosed in BAE's revised request for proposal revealed Raytheon trade secrets—including but not limited to the System Dimensions and Configuration Trade Secret and the Wavelength Information Trade Secret—that represent the culmination of a costly design and engineering effort by Raytheon.

77. This information was not generally known to the public or readily ascertainable, and it derived economic value precisely because it was proprietary to Raytheon.

78. As set forth above, Raytheon took reasonable steps to keep its proprietary information secret.

79. BAE misappropriated Raytheon's trade secrets by disseminating them in the revised request for proposal to DRS without authorization, in violation of the Agreement.

80. DRS misappropriated Raytheon's trade secrets. It acquired the trade secrets through improper means—i.e., by BAE's breach of the Agreement—and although Raytheon promptly informed DRS of this fact, DRS did not cease the misappropriation.

81. DRS also misappropriated the trade secrets by using them in its bid responding to

BAE's second revised request for proposal, despite Raytheon's express notice to DRS that the revised request contained Raytheon's trade secrets.

82. Despite repeated warnings from Raytheon, BAE and DRS have failed to cease their misappropriation.

83. As a direct and proximate result of BAE and DRS' actions, Raytheon has suffered substantial damages in an amount to be established at trial.

84. Moreover, BAE and DRS' actions have caused and will cause Raytheon irreparable harm if not preliminarily and permanently enjoined.

## COUNT III
### (Breach of Contract)

85. The allegations contained in paragraphs l through 84 are repeated and realleged as if fully set forth herein.

86. The Agreement created a legally enforceable obligation between Raytheon and BAE not to disclose proprietary information to unauthorized third parties.

87. BAE breached the Agreement when it disseminated Raytheon's trade secrets to DRS in the revised request for proposal without express or implied permission from Raytheon. Specifically, BAE breached at least Paragraphs 2 and 4 of the Agreement by disclosing to a third party Raytheon's trade secrets despite the fact that Raytheon clearly had labeled them as proprietary. Ex. A ¶¶ 2, 4.

88. BAE's breach caused Raytheon serious harm by substantially diminishing Raytheon's chance of placing a successful bid.

89. BAE's breach also caused Raytheon irreparable harm by potentially destroying Raytheon's trade secrets, creating a new competitor in the military sight system market, and harming Raytheon's reputation in the marketplace.

90. Indeed, the Agreement itself expressly recognizes that "due to the unique nature of disclosing Proprietary Information, there can be no adequate remedy at law for any breach," and thus "any such breach may result in irreparable harm … entitl[ing the harmed party] to seek equitable relief in addition to remedies it might have at law." Ex. A ¶ 9.

## PRAYER FOR RELIEF

WHEREFORE, Raytheon respectfully requests that this Court enter the following relief:

A. Enter judgment against Defendants for monetary damages to compensate Raytheon for the harms described above.

B. Enjoin BAE against further unauthorized dissemination or use of Raytheon's confidential, proprietary and trade secret information.

C. Enjoin DRS against use or dissemination of Raytheon's confidential, proprietary and trade secret information and require DRS to destroy trade secret information currently in its possession.

D. Award Raytheon its attorneys' fees and costs pursuant to the Defend Trade Secrets Act and the Virginia Uniform Trade Secrets Act

E. Grant Raytheon any other relief that the Court deems just and proper.

Dated: March 1, 2019

Respectfully Submitted,

RAYTHEON COMPANY

By its attorney,

\_\_\_/s/ Gregory H. Lantier_____
Gregory H. Lantier (Va. Bar No. 65657)
Attorney for Raytheon Company
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.

Washington, D.C.  20006  
Phone: (202) 663-6000  
Fax:    (202) 663-6363  
Email: Gregory.Lantier@wilmerhale.com

## VERIFICATION

**State of California**

**County of Los Angeles**

The undersigned authorized representative of Raytheon Company, being duly sworn on his oath, does hereby state that he has read the foregoing Verified Complaint, that the attached Exhibit A is a true and correct copy of the Proprietary Information Agreement that Raytheon and BAE signed in May 2016, and that the statements set forth in the foregoing Verified Complaint are true as he believes based on his personal knowledge, through information supplied to him by Plaintiff's employees and agents, and through records kept by Plaintiff in the ordinary course of business. Word usage and sentence structure may be that of the attorneys assisting in the preparation of the Complaint and thus does not purport to be the precise language of the person executing the same.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 1, 2019.

By: _____
Richard Song