**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| RAYTHEON COMPANY, a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> BAE SYSTEMS, INC., a Delaware corporation; BAE SYSTEMS LAND & ARMAMENTS LP, a Delaware limited partnership; LEONARDO DRS, INC., a Delaware corporation; and DRS NETWORK & IMAGING SYSTEMS, LLC, a Delaware limited liability company, <br><br> Defendants. | Civil Action No. 1:19-cv-251 |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 7, Plaintiff Raytheon Company ("Raytheon"), by its undersigned counsel, hereby respectfully requests that this Court issue a preliminary injunction against Defendants BAE Systems, Inc. ("BAE Systems"), BAE Systems Land & Armaments LP ("BAE Land & Armaments") (collectively "BAE"), Leonardo DRS, Inc. ("DRS, Inc."), and DRS Network & Imaging Systems, LLC ("DRS Network & Imaging") (collectively "DRS").

**INTRODUCTION**

Raytheon is a prominent American defense contractor with a reputation for innovation and technical expertise in military technology ranging from missiles to tanks. Relying on that record of excellence, BAE asked Raytheon to design the gunner's sighting system for a new kind of light tank (known as a Mobile Protected Firepower vehicle) to include as part of BAE's bid to

1

build the whole vehicle for the U.S. Army. In furtherance of these discussions, BAE and Raytheon signed a contract in the form of a proprietary information agreement that allowed them to share their respective proprietary information, but that strictly barred dissemination of that information by either BAE or Raytheon to any third party.

Working with minimal input from BAE, Raytheon spent months of effort and millions of dollars to develop a sighting system that improved on existing technology and also could fit within the narrow confines of the light tank. Raytheon's resulting submission to BAE in February 2018 featured a fully developed and innovative gunner sighting system that solved the problems BAE had faced. The improved system incorporated numerous valuable Raytheon trade secrets, including, for example, details on (1) the precise shapes, configurations, and dimensions of the sighting system and (2) the optimal wavelength setting for the outward-facing optics system that provides the gunner's view of the outside world.

BAE won the Mobile Protected Firepower vehicle contract from the U.S. Army in late December 2018, based in part on Raytheon's innovative sighting system design. But rather than award the sighting system subcontract to Raytheon, BAE promptly released a revised request for proposal that included numerous instances of Raytheon's proprietary information and sent that request to *both* Raytheon and at least one other defense contractor, DRS.

This unauthorized disclosure of Raytheon's valuable trade secrets has created an urgent need for injunctive relief against both BAE and DRS. Despite Raytheon's repeated requests, BAE has refused to agree that it will not disseminate Raytheon's trade secrets any further. And DRS has not only refused to respond to Raytheon's request that DRS surrender the improperly acquired trade secrets, but it has affirmatively used those trade secrets to **bid against Raytheon** in response to BAE's request for proposals to produce the sighting system.

As courts in this district have explained, "a trade secret, once lost is, of course, lost forever." *Home Funding Grp., LLC v. Myers*, 2006 WL 6847953, at *2 (E.D. Va. Dec. 14, 2006). Unless this Court enters a preliminary injunction preventing BAE and DRS from further use and dissemination of Raytheon's trade secrets, they will forever destroy Raytheon's valuable intellectual property.

## BACKGROUND

Raytheon is an industry leader in defense and government electronics. Compl. ¶ 9.[1] The military products that it designs are used around the world by the United States and its allies, including the Patriot missile system that serves as an important element of America's air and missile defense system. *Id.* ¶ 10. Raytheon also develops land-based equipment, including anti-tank missiles, long-range surveillance Sensors, and combat vehicle Fire Control Sights for both the U.S. Army and the Marine Corps. *Id.* ¶ 11.

In May 2016, Raytheon entered into a proprietary information agreement ("the Agreement") with fellow defense contractor BAE. Compl. ¶ 18 & Ex. A. The purpose of the agreement was to allow Raytheon and BAE to safely share proprietary information "in oral, visual, or written form" about "future armored Fighting Vehicles." *See* Compl. ¶ 19 & Ex. A.

As part of the Agreement, Raytheon and BAE pledged both that (1) a party receiving proprietary information "shall maintain [it] in confidence and shall not use such Proprietary Information except for the Purpose of this Agreement," and (2) any such information disclosed "shall not be distributed, disclosed or disseminated to a third party." Compl. Ex. A ¶¶ 2, 4; *see also* Compl. ¶¶ 19-20. The parties also agreed that "due to the unique nature" of proprietary

---

[1] Because Raytheon has verified the Complaint, the document can be "treated as an affidavit." *E.g.*, *Germain v. Shearin*, 725 F. App'x 225, 226 (4th Cir. 2018).

information, "any breach" of the agreement "may result in irreparable harm to the disclosing party." Compl. Ex. A ¶ 9; *see also* Compl. ¶ 21.

Under the protections afforded by the Agreement, BAE asked Raytheon to design and supply a "Gunner's Primary Weapon Sight System" for use in a Mobile Protected Firepower vehicle, as part of a bid BAE was preparing to submit to the U.S. Army. Compl. ¶¶ 12, 18. In short, a Mobile Protected Firepower vehicle is a form of light tank, designed for easy transportation by air. *Id.* ¶ 12. The vehicle's relatively small size and weight, however, poses significant engineering challenges. *Id.* ¶ 13. For example, the turret of the vehicle (i.e., the upper-half) is smaller than the turret of a traditional Main Battle Tank but must contain analogous equipment while still leaving room for the vehicle's crew. *Id.*

As part of BAE's Mobile Protected Firepower vehicle bid efforts, BAE asked Raytheon to design and supply a sighting system that will serve as the gunner's eyes to the outside world. Compl. ¶ 14. BAE chose Raytheon for this task both because of Raytheon's deep technical expertise and its willingness to invest its own resources in the necessary research and development needed to create cutting-edge sighting technology. *Id.* Accordingly, BAE by-and-large left the details of the sighting system's design to Raytheon, instructing only that the system needed to meet specified performance requirements and needed to fit within a limited space in the vehicle's turret. *Id.* ¶ 15.

Raytheon subsequently invested months of work and millions of dollars into developing its innovative Gunner's Primary Weapon Sight System ("the PWS System"). Compl. ¶ 16. Not only is the PWS System a dramatic improvement over first-generation sighting technology in terms of performance, but it fits neatly into an even smaller amount of space than first-generation technology. *Id.* ¶ 17.

On February 23, 2018, Raytheon submitted an extensive bid to BAE. Compl. ¶ 26. Pursuant to the Agreement, the proprietary information in the accompanying documentation laying out the details for how Raytheon planned to construct the PWS System was clearly labeled as proprietary. *Id.* ¶ 32.

Proprietary information was deeply interwoven throughout Raytheon's bid. Compl. ¶ 26. For example, while the original request for proposal did not provide details about the exact dimensions of the PWS System, Raytheon's bid provided intricate diagrams laying out the precise shapes, configurations, and dimensions of the System as a whole and four individual pieces—the primary weapon sight, the control unit, the power supply, and the display unit (collectively, "the System Dimensions and Configuration Trade Secret"). *Id.* ¶¶ 27-29.

As another example, Raytheon's bid also included detailed information about one piece of the System—the gunner's primary weapons sight. Compl. ¶ 30. That piece allows the person using the System to view the landscape surrounding the vehicle via outward-facing Day View Optics. *Id.* Raytheon calculated the optimal daytime wavelength range to provide clear detail to the colors in the surrounding landscape ("the Wavelength Trade Secret"). *Id.* This range was determined to be preferable after extensive trial and error, based on a method of testing applied by Raytheon to Raytheon's own design. *Id.* ¶ 31. The range is narrower than is standard in the industry, making it easier for a gunner to discern targets in the haze and degraded conditions of a battlefield environment. *Id.* Raytheon's bid similarly included considerable additional proprietary information. *Id.* ¶ 32.

After receiving Raytheon's bid, BAE entered into technical discussions with Raytheon under the protection of a non-disclosure agreement, which Raytheon understood to indicate that BAE was planning to work with Raytheon as the contractor for the PWS System. Compl. ¶ 33.

However, just days after the Army awarded BAE a $375 million contract for the Mobile Protected Firepower vehicle, BAE sent out a revised request for proposal to both Raytheon and at least one other defense contractor—DRS. Compl. ¶¶ 36-38.

The revised request for proposal included more detail than the original. In particular, an attached specification incorporated numerous instances of Raytheon's proprietary information that were included as part of Raytheon's original bid, including the System Dimensions and Configuration Trade Secret and the Wavelength Trade Secret. *See* Compl. ¶ 39.

After a careful examination of the revised request for proposal and attached specification, Raytheon sent BAE a letter dated January 18, 2019 documenting the Raytheon trade secrets disclosed and asking for an explanation. Compl. ¶ 41. Raytheon also asked BAE to take a number of mitigating steps to avoid further use or disclosure of Raytheon's trade secrets. *Id.*

Over the following weeks, Raytheon and BAE exchanged a number of letters. Compl. ¶¶ 41-44. On February 13, representatives from Raytheon and BAE met in person. *Id.* ¶ 45. The next day, BAE issued a second revised request for proposal that omitted references to some of Raytheon's trade secrets, including the Wavelength Trade Secret. *Id.* ¶ 46. BAE did not, however, modify the request to remove the System Dimensions and Configuration Trade Secret or a number of others. *Id.*

Also on February 14, Raytheon sent a letter formally notifying DRS that it had acquired Raytheon's trade secrets as a result of BAE's unauthorized disclosure in the initial revised request for proposal. Compl. ¶ 47. While Raytheon did not receive a formal reply from DRS, Raytheon was informed by BAE a week later that DRS had submitted a bid in response to the second revised request for proposal. *Id.* ¶¶ 50, 58. This news came as a surprise to Raytheon, as DRS had previously lacked the technical capabilities to submit a competitive bid. *Id.* ¶ 52.

Indeed, prior to BAE's issuance of the revised proposal, Raytheon had been relying on DRS to supply a key component necessary for Raytheon's own bid. *Id.*

Raytheon submitted its own bid in response to the revised proposal on March 1, 2019. Compl. ¶ 51. Raytheon's bid was delayed because DRS—in an email to a Raytheon employee—took the position that it would not supply the key component unless Raytheon agreed to hold DRS harmless for all claims associated with BAE's unauthorized disclosure of trade secrets. *Id.* ¶ 54. Because Raytheon was not willing to surrender its intellectual property rights, DRS did not agree to supply the component. *Id.* ¶ 55. As a result, Raytheon was delayed by the need to figure out an alternative approach, which in turn slowed Raytheon's ability to submit a bid on the revised request for a proposal. *Id.* ¶ 56.[2]

## ARGUMENT

To obtain a preliminary injunction, Raytheon must show that: (1) it is likely to succeed on the merits of its case; (2) it is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of the equities tips in Raytheon's favor; and (4) an injunction would be in the public interest. *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)).

Raytheon meets all four requirements. First, both BAE and DRS have violated the federal Defend Trade Secrets Act (DTSA) and the Virginia Uniform Trade Secrets Act

---

[2] Raytheon's bid in response to the second revised request for proposal does not in any way constitute an admission that BAE's unauthorized disclosure of its valuable trade secrets was in any way excusable or justifiable. In submitting its bid, Raytheon has reserved its rights by noting that "[a]s set forth in prior correspondence, Raytheon does not consent to the unauthorized use and disclosure of Raytheon trade secret and proprietary information in the Request for Proposals or otherwise. Raytheon expressly reserves all rights to pursue all forms of relief." And, as detailed in this filing and in the Complaint, BAE's disclosure was unlawful and caused Raytheon irreparable harm that cannot be satisfied by the mere award of the sighting system subcontract.

(VUTSA) by misappropriating Raytheon's valuable and secret proprietary information and BAE has relatedly breached its agreement not to disclose Raytheon's proprietary information to a third party. Second, Raytheon will suffer irreparable harm if its request for injunctive relief is not granted because further dissemination of its valuable trade secrets will both destroy them forever and damage Raytheon's reputation in the defense industry. Third, neither BAE nor DRS can claim that they will suffer harm commensurate with Raytheon's loss of trade secrets if an injunction is granted. BAE can still perform its contract with the federal government and DRS can still submit a proposal—DRS just cannot use, rely on, or otherwise disclose Raytheon's trade secrets in doing so. Lastly, the public interest favors granting an injunction in order to protect Raytheon's statutory rights under the DTSA and VUTSA, as well as under Raytheon's valid proprietary information agreement with BAE.

### I. Raytheon Is Likely To Succeed On The Merits

Raytheon is likely to succeed on the merits of its trade secrets and breach of contract claims. As the Fourth Circuit has explained, a party seeking a preliminary injunction does not need to establish "a ***certainty*** of success" at trial, but rather must simply provide a "clear showing" that it is ***likely*** to succeed. *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013) (emphasis added). And although Raytheon is likely to prevail on all of the claims asserted, it "need only show likelihood of success on ***one*** claim to justify injunctive relief." *XL Specialty Ins. Co. v. Truland*, 2014 WL 4230388 at *2 (E.D. Va. Aug. 21, 2014) (emphasis added).

### A. BAE and DRS Misappropriated Raytheon's Trade Secrets

To prevail under the DTSA, Raytheon must establish that: (1) it owns a trade secret; (2) the trade secret was misappropriated; and (3) the trade secret implicates interstate or foreign commerce. *See Space Systems/Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 853 (E.D.

Va. 2018). And to prevail under the very similar VUTSA, Raytheon must establish: "(1) the existence of a trade secret; and (2) the misappropriation of that trade secret by the defendant." *Id.* at 855. Those requirements are easily met here.

> 1. *The System Dimensions and Configuration Information and Wavelength Information Qualify As Trade Secrets*

The System Dimensions and Configuration information and the Wavelength information—which are merely two examples of the numerous pieces of proprietary information defendants misappropriated—plainly qualify as trade secrets. Under both the DTSA and the VUTSA, a trade secret is information that "(1) [has] independent economic value; (2) [is] not known or readily ascertainable by proper means; and (3) [is] subject to reasonable efforts to maintain secrecy." *Audio-Video Group, LLC v. Green*, 2014 WL 793535, at *4 (E.D. Va. Feb. 26, 2014) (discussing the VUTSA); *accord* 18 U.S.C. § 1839(3).

*First,* Raytheon derives independent economic value from the System specifications, including the System Dimensions and Configuration information and Wavelength information. Raytheon is an innovative company that invests significant resources in research and development to maintain its competitive market position. *See* Compl. ¶¶ 9, 14. Raytheon's technical expertise with weapons systems is its stock-in-trade, *id.* ¶¶ 9-12, 14, and it loses the ability to leverage its skill when its designs are freely available to competitors that did not have to make the same economic investments as Raytheon.

BAE's disclosure of the System Dimensions and Configuration information illustrates the problem. The System Dimensions and Configuration were not dictated in any significant way by the shape or size of the Mobile Protected Firepower vehicle beyond the total amount of empty space in the turret that could be allocated to the System. Compl. ¶¶ 15, 27-29. Rather, the Dimensions and Configuration were developed as the result of a lengthy design process within

9

Raytheon to determine how to fit a compliant design with the space provided. *Id.* ¶¶ 16, 28. And once revealed to a competitor like DRS, the System Dimensions and Configuration information allows others to benefit from the fruits of Raytheon's innovation and hard work. *See, e.g.*, *id.* ¶¶ 52-58. In short, the System Dimensions and Configuration information was "created after considerable economic investment" and "disclosure . . . could create an unfair competitive advantage." *Space Systems*, 306 F. Supp. 3d at 854.

Similarly, the Wavelength information was created using Raytheon's technical expertise, combined with labor-intensive trial and error, to determine the optimal settings that would allow the gunner manning a Mobile Protected Firepower vehicle to be able to see as clearly as possible. Compl. ¶¶ 30-31. Notably, the Wavelength information differed from the standard approach in the field. *Id.* This additional fine-tuning provided a substantial improvement to visibility over the norm. *Id.* ¶ 31.

*Second*, Raytheon's proprietary information is not generally known. *See Steves and Sons, Inc. v. Jeld-WEN, Inc.*, 2018 WL 1796293 at *10 (E.D. Va. Apr. 16, 2018) (explaining this "requirement refers not to knowledge of the public at large, but rather to the knowledge of other members of the relevant industry"). Raytheon developed its design for the System at BAE's request, a request made in light of Raytheon's experience in the field and its willingness to invest significant internal resources to the task. Compl. ¶ 14. Raytheon relied on both institutional knowledge and hard work to develop cutting-edge second-generation technology, resulting in developments that were known *only* to Raytheon and BAE (acting under the limitations of the Agreement) before BAE's unauthorized disclosure in the revised request for proposal. Compl. ¶¶ 14-17, 18-20, 32.

Relatedly, Raytheon's PWS System specifications are not readily ascertainable through proper means. *See MicroStrategy Inc. v. Business Objects, S.A.*, 331 F. Supp. 2d 396, 417 (E.D. Va. 2004) (this requirement "boils down to assessing the ease with which a trade secret could have been independently discovered"). Here, Raytheon's trade secrets—including the System Dimensions and Configuration information and the Wavelength information—could not have been independently discovered without the significant time, money, and expertise that Raytheon devoted to the vital task of developing the PWS System that functions as the eyes of the gunner in a Mobile Protected Firepower vehicle. Compl. ¶¶ 16-17, 26-31.

*Third*, Raytheon has taken reasonable measures to keep its proprietary information secret. Raytheon, for example, routinely employs non-disclosure or proprietary information agreements when its employees discuss any kind of proprietary information with a third party. *E.g.*, Compl. ¶¶ 18, 33 & Ex. A. Raytheon followed that practice here when it entered into the Agreement with BAE and only shared its proprietary information, including the System Dimensions and Configuration Trade Secrets and Wavelength Trade Secrets, subject to that Agreement. *Id.* ¶¶ 18, 26 & Ex. A. The Agreement, in turn, required BAE to maintain the confidentiality of Raytheon's proprietary information labeled as such and barred disclosure of that information to third parties except with Raytheon's consent. Compl. ¶ 19.

By making disclosures to BAE in strict confidence and clearly labeling all proprietary information provided, Raytheon maintained the secrecy of all the proprietary information incorporated in its bid, including the System Dimensions and Configuration information and the Wavelength information. *See MicroStrategy*, 331 F. Supp. 2d at 416 ("[T]he owner of a trade secret may, without losing protection disclose it to a licensee, an employee, or a stranger, if the disclosure is made in confidence, express or implied."); *Space Systems*, 306 F. Supp. 3d at 853

("SSL sufficiently pleads that it took reasonable efforts to keep this information secret by including proprietary markings and labels describing the highly sensitive nature of materials.").

### 2. *BAE And DRS Misappropriated Raytheon's Trade Secrets*

BAE and DRS also misappropriated Raytheon's valuable trade secrets. Under both the DTSA and the VUTSA, the misappropriation requirement is satisfied when a trade secret is improperly (1) disclosed, (2) used, or (3) acquired. *See* 18 U.S.C. § 1839(5); Va. Code Ann. § 59.1-336. Here, BAE improperly disclosed Raytheon's trade secrets, and DRS in turn improperly acquired and then used them.

Misappropriation under an improper-disclosure theory requires establishing "disclosure … of a trade secret of another without express or implied consent by a person who . . . [a]t the time of the disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain" its secrecy or limit its use. 18 U.S.C. § 1839(5); Va. Code Ann. § 59.1-336; *see also Space Systems*, 306 F. Supp. 3d at 854-55. Here, BAE disclosed Raytheon's trade secrets without Raytheon's consent and—at a bare minimum—should have known that it had a duty to maintain the secrecy of Raytheon's system specifications.

Specifically, BAE was contractually obligated not to disclose or disseminate Raytheon's proprietary information, including the System specifications, without Raytheon's approval. Compl. Ex. A ¶¶ 1-2, 4; *see also* Compl. ¶¶ 18-20. Raytheon's bid that included the trade secrets clearly marked them as proprietary. Compl. ¶ 32. And BAE indisputably used Raytheon's valuable trade secrets in a revised request for proposal and distributed that request to DRS—a third party who did not have Raytheon's permission to acquire that information. Compl. ¶ 39.

BAE may argue, as it did in its initial correspondence with Raytheon, that any similarity is a mere coincidence or the result of independent development. But this is belied by even a cursory comparison between Raytheon's trade secrets and BAE's revised request for proposal. BAE's revised request, for example, recited the Wavelength Trade Secret verbatim despite the fact that a different wavelength is the industry norm. Compl. ¶¶ 30-31, 39. Similarly, BAE's revised request asked for bids for a sighting system that uses almost precisely the same shapes, size, and configurations as the System Dimensions and Configuration Trade Secret. Compl. ¶ 39.

BAE may also try to explain away these telling similarities by arguing that the revised specification's shape, dimensions, and configuration was based on a 1994 specification produced by Hughes Aircraft. Such an argument would be highly misleading. The 1994 Hughes Aircraft document, which was in fact developed by Raytheon scientists who designed the System at issue in this case, represented first-generation technology. Compl. ¶¶ 14, 17. The Raytheon System, which embodies its trade secrets, is second-generation technology that is both more compact and more effective than what existed two-and-a-half decades ago. *Id.* To argue otherwise is equivalent to suggesting that engineers could independently generate an iPhone X based solely on the kind of rudimentary personal digital assistants that existed in 1994. And tellingly, BAE and its engineers have not explained precisely how they could have generated the portions of the revised proposal that overlap with Raytheon's trade secrets based solely on the 1994 document. *Id.* ¶ 44.

Raytheon also is likely to succeed on its claim that DRS misappropriated Raytheon's trade secrets for two independent reasons. *First*, DRS improperly acquired and kept Raytheon's trade secrets even though it knew—no later than upon receiving Raytheon's February 14 letter—

that BAE had breached its promise to maintain the secrecy of the trade secrets.  *See* 18 U.S.C. § 1839(5) ("acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" constitutes misappropriation); *see also Integrated Global Services v. Mayo*, 2017 WL 4052809 at *8 (E.D. Va. Sept. 13, 2017) ("Under the plain language of the [VUTSA], mere *acquisition* of a trade secret [even without use or disclosure] by the improper means listed in the statute is sufficient to establish misappropriation").

BAE has conceded that it sent the revised request for proposal containing Raytheon's trade secrets to both Raytheon and DRS.  *See supra* p. 6.  Disclosing the trade secrets to DRS in that manner was a breach of the duty of confidentiality imposed by the Agreement, Compl. Ex. A ¶¶ 2, 4, which constitutes "improper means" under both the VUTSA and the DTSA.  *See* 18 U.S.C. § 1839(6)(A); VA. Code Ann. § 59.1-336.  And DRS was put on notice about BAE's improper conduct by Raytheon's February 14 letter.  *See supra* p. 6.  Indeed, even setting aside the February 14 letter, DRS demonstrated its knowledge that its acquisition of Raytheon's trade secrets was legally questionable by refusing to supply Raytheon with a key component for Raytheon's bid unless Raytheon agreed to hold DRS harmless for all claims associated with BAE's unauthorized disclosure of trade secrets.  Compl. ¶ 54.

*Second,* DRS also misappropriated Raytheon's trade secrets by ***using*** them in its bid in response to BAEs' revised request for proposal.  *See* 18 U.S.C. § 1839(5) ("[U]se of a trade secret of another without express or implied consent by a person who . . . [a]t the time of the disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret" constitutes misappropriation); *accord* Va. Code Ann.

§ 59.1-336. Specifically, DRS made a bid on the second revised proposal, but it did not have the technical expertise to do so without using Raytheon's trade secrets. Compl. ¶¶ 52-58. And, as discussed above, DRS was made aware of its improper acquisition of Raytheon's trade secrets in the February 14 letter and apparently entered its bid around that time. *See* Compl. ¶¶ 38, 46, 50, 58. At a minimum, given the highly detailed nature of the revised request (in light of its incorporation of Raytheon's trade secrets), DRS had reason to be aware that it was using improper trade secret information in its bid. *See id.* ¶ 52.

        3.     *Raytheon's Trade Secrets Implicate Interstate Or Foreign Commerce*

Finally, Raytheon's trade secrets implicate interstate or foreign commerce, as required under the DTSA. *See* 18 U.S.C. § 1836(b)(1). The PWS System's specification—and the System Dimensions and Configuration and Wavelength Trade Secrets in particular—will be used to build Mobile Protected Firepower vehicles, which will be deployed around the globe and at multiple Army locations around the United States. *See* Compl. ¶ 12. Moreover, BAE manufactured the Mobile Protected Firepower vehicle bid sample that they submitted to the Army—and that included Raytheon's valuable trade secrets—in Minnesota and Michigan, and DRS' manufacturing facility is located in Florida. *Id.* ¶¶ 36, 58. And if Raytheon receives the contract, it will manufacture the PWS System in California and Texas. *Id.* ¶ 51.

    **B.**    **BAE Breached Its Contractual Obligations By Disclosing Raytheon's Trade Secrets To DRS Without Authorization**

Raytheon also is likely to prevail on its breach-of-contract claim against BAE. "The elements of a breach of contract action under Virginia law are: '(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of the obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.'" *Hair Club for Men, LLC v. Ehson*, 2016 WL 3636851, at *2 (E.D. Va. May 6, 2016) (quoting *Filak v. George*,

15

267 Va. 612, 619 (2004)).  Raytheon and BAE are parties to an agreement that contractually obligates BAE to maintain the confidentiality of Raytheon's proprietary information.  Compl. Ex. A ¶¶ 1-2, 4.  BAE breached at least paragraphs 2 and 4 of the Agreement by disclosing Raytheon's proprietary information to DRS without Raytheon's permission.  *Id.* ¶ 2 ("[T]he receiving Party shall maintain Proprietary Information in confidence."); *id.* ¶ 4 ("[T]he receiving party agrees that any Proprietary Information … shall not be distributed, disclosed or disseminated to any third party.").  Finally, Raytheon has suffered significant injury—indeed, irreparable harm—as a result of BAE's breach because it led to DRS acquiring and using Raytheon's trade secrets, with the resultant harms detailed below.  *See infra* pp. 16-18; *see also* Compl. ¶¶ 59-62.

## II.   Raytheon Will Suffer Irreparable Harm If This Court Does Not Grant A Preliminary Injunction

Raytheon has been irreparably harmed by the misappropriation of its trade secrets, and it continues to face irreparable injury that will go unabated unless the Court enters a preliminary injunction.

*First,* Raytheon is suffering irreparable harm each day that its trade secrets remain in the possession of those who have misappropriated them.  As courts in this district have explained, "[t]he disclosure of trade secrets establishes immediate irreparable harm because 'a trade secret, once lost is, of course, lost forever.'"  *Home Funding Grp.*, 2006 WL 6847953, at *2.  BAE's unauthorized disclosure—and DRS' improper acquisition and use—of Raytheon's trade secrets mean that the proprietary information that Raytheon spent time, money and effort in developing will be available to others with no guarantee of secrecy.  Compl. ¶ 60.  Both BAE and DRS have already demonstrated that they have no compunctions about sharing Raytheon's valuable trade secrets.  BAE has refused to remove all of Raytheon's proprietary information from the current

16

version request—including Raytheon's System Dimensions and Configuration Trade Secret—and DRS has declined to withdraw its bid or otherwise pledge not to use Raytheon's proprietary information. *See* Compl. ¶¶ 41-50, 58. This is sufficient to establish irreparable harm. *See Datatel, Inc. v. Rose & Tuck LLC*, 2005 WL 1668020, at *6 (E.D. Va. June 17, 2005) (irreparable harm where trade secret owner "lack[ed] control over [defendant's] use" of its materials and defendant was likely use trade secrets in the future). Indeed, BAE has expressly recognized that *any* breach of the Agreement could cause irreparable harm. *See supra* pp. 3-4.

*Second*, BAE and DRS' improper acts—if left unremedied—will damage Raytheon's reputation and goodwill in the competitive world of military contracts. *See, e.g.*, *API Tech. Servs., LLC v. Francis*, 2013 WL 12131381, at *3 (E.D. Va. Dec. 4, 2013) ("When the failure to grant preliminary relief creates the possibility of permanent loss of customers … or the loss of goodwill, the irreparable injury prong is satisfied."). The defense industry is made up of a relatively small number of repeat players, who compete or cooperate with each other depending on the particular contract at issue. Here, BAE's disclosure and DRS' acquisition and use of Raytheon's information have placed Raytheon in the unenviable position of (1) having to compete with a rival bid fueled by Raytheon's own proprietary technology and (2) losing a supplier on whom it had planned to rely in order to submit a bid in the first place. Compl. ¶¶ 54-55, 57, 61. Indeed, BAE has already begun to openly question Raytheon's ability to fulfill contracts in a timely fashion despite the fact that BAE's unauthorized disclosure (coupled with DRS' stonewalling) is what caused the delay in the first place. *Id.* ¶ 62. Absent injunctive relief, the untenable situation created by DRS and BAE will continue to worsen and BAE's false accusations may affect Raytheon's ability to do business with other contractors.

*Third*, and relatedly, BAE and DRS' improper acts have led to the irreparable harm of transforming one of Raytheon's suppliers—DRS—into a new competitor in the military sight system market, and one that has none of the R&D costs that Raytheon did in developing its PWS System. Compl. ¶¶ 52-58, 62. Armed with Raytheon's valuable trade secrets, DRS now has the ability to compete directly with Raytheon on an unknowable number of future contracts. This constitutes irreparable harm not simply "because [DRS] is competing with [Raytheon] but because [DRS] seeks to use [trade secret] information generated by [Raytheon] to obtain [Raytheon's] existing or potential customers." *See Audio-Video Group*, 2014 WL 793535 at *6.

### III.     The Balance Of The Equities Weighs Heavily In Raytheon's Favor

The equities at issue here favor Raytheon. Without an injunction preventing further use or dissemination of Raytheon's trade secrets, Raytheon will continue to suffer irreparable harm. *See supra* pp. 16-18. At the same time, a preliminary injunction would simply require BAE and DRS to comply with state and federal law and—in the case of BAE—to honor a valid contract.

BAE and DRS might try to articulate some theoretical harm that will befall them if they are required to cease their ongoing misappropriation, such as (in BAE's case) a minor delay in fulfilling the Mobile Protected Firepower vehicle contract or (in DRS' case) the loss of a bid in response to BAE's revised request for proposal. But the fact that they might suffer "the self-inflicted harm that comes to those who base their businesses on [misappropriated] trade secrets" does not tip the scales in their favor. *API Tech. Servs.*, 2013 WL 12131381, at *3. To the contrary, "a balancing of the equities strongly granting an injunction to foreclose the enjoined party from benefitting from its misappropriation of [Raytheon's] trade secrets." *Id.* (alterations omitted).

BAE's position is particularly unsympathetic. Throughout most of 2018, BAE led Raytheon to believe it would be BAE's supplier for the System. *See* Compl. ¶¶ 33-34. Then, in December 2018, BAE abruptly backtracked after it won award of the Mobile Protected Firepower vehicle contract and invited DRS to bid for the right to supply the System—according to Raytheon's specifications. Compl. ¶¶ 36-40. Any harm suffered by BAE in the form of a slight delay as a result of its improper tactics and trade secret misappropriation can hardly be compared to the magnitude of the irreparable harm Raytheon will suffer—through no fault of its own—if an injunction is not granted.

## IV. A Preliminary Injunction Would Be In The Public Interest

An injunction would serve the public interest because it would prevent further misappropriation of Raytheon's trade secrets. As courts in this district have explained, "there is . . . a significant public interest in maintaining the confidentiality of trade secrets and preventing their misappropriation." *MicroStrategy*, 369 F. Supp. 2d at 736; *see also Autopartsource, LLC v. Bruton*, 2013 WL 3766524 at *13 (E.D. Va. July 16, 2013) ("While there also exists a public interest in free competition, that interest typically bows to the interest in protecting trade secrets absent some justification to the contrary."). BAE's breach of the Agreement provides additional support for this conclusion, as the public interest also "favors the … enforcement of valid contracts." *See Mayo*, 2017 WL 4052809, at *9.

## V. Raytheon Should Not Be Required To Post A Bond Beyond A Nominal Amount

Federal Rule of Civil Procedure 65(c) requires the party seeking a preliminary injunction to post a bond before the injunction will issue, but the Fourth Circuit had held that a district court has the authority to impose only a nominal bond where "the risk of harm" to the enjoined parties "is remote." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir.

1999). Here, as explained above, it is highly unlikely that an injunction would improperly harm BAE and DRS—or even harm them at all, beyond any that is self-inflicted as a result of their misappropriation of Raytheon's valuable trade secrets. *See supra* pp. 18-19.

## CONCLUSION

Raytheon's motion for a preliminary injunction should be granted.

Dated: March 1, 2019

Respectfully Submitted,

RAYTHEON COMPANY

By its attorney,

　/s/  Gregory H. Lantier
Gregory H. Lantier
Virginia Bar No. 65657
Attorney for Raytheon Company
WILMER CUTLER PICKERING
　HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C.  20006
Phone: (202) 663-6327
Fax:　 (202) 663-6363
Email: gregory.lantier@wilmerhale.com